# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

LARRY D. DYSLIN, II,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. 18-CV-0014-LTS

**REPORT AND RECOMMENDATION**

---

Plaintiff Larry D. Dyslin, II, seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Dyslin argues that the ALJ erred in failing to resolve an inconsistency between the VE's testimony and the Occupational Information Network (O*NET), that the testimony of the vocational expert (VE) does not support the ALJ's step-five determination that Dyslin could perform other work, and that "overwhelming evidence shows [Dyslin] is unable to function outside of a highly structured, supportive, environment." Doc. 11. Dyslin also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018). I recommend **reversing** the Commissioner's decision and **remanding** for further proceedings.

## I.    BACKGROUND[1]

Dyslin has been institutionalized or imprisoned for much of his life. He lived in treatment centers or homes for troubled youth from ages 12 to 19, with only a brief period

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 10).

back home at age 16 (which ended after he threatened a police officer with a knife). AR 246, 259, 638, 671, 700, 705, 782.[2] As a result, he attended school only through the fifth or sixth grade and completed his education through the eleventh grade at treatment centers. *Id.* In 1995, at age 18, he was transferred to the Minnesota Security Hospital after assaulting (or attempting to assault) another patient. AR 698, 782. He remained civilly committed there until March 2005, when providers opined that antipsychotic medications had little effect on his behavior and that his "impulsive behavior was actually contrived and controlled." *See* AR 777-73. They concluded that he did not suffer from an Axis I diagnosis (like schizophrenia or bipolar disorder) and instead, suffered from antisocial personality disorder. *See, e.g.*, AR 730.

About a week after his release from the Minnesota Security Hospital in 2005, Dyslin was arrested for breaking into another person's room at the motel where he was living. AR 695, 772. He remained jailed for a few months, and in July 2005, he was once again committed to the Minnesota Security Hospital. AR 695. Providers at the Minnesota Security Hospital did not support his commitment, as they did not believe he met the definition of mentally ill. *See* AR 695, 736. As such, he was not prescribed antipsychotic medication during his second stint at the Minnesota Security Hospital, although he occasionally attended group therapy sessions. AR 701, 744, 774. He remained civilly committed at the Minnesota Security Hospital for six years, until July 9, 2011. AR 678, 773-78. Treatment notes from this time period reflect "periods of appropriate behavior," where he would participate in therapy, play video and card games, and generally interact appropriately with staff and other patients; as well as times where he engaged in threatening, assaultive, or destructive behavior that resulted in his segregation or being charged with crimes. AR 695-97, 701-02, 717-19, 728-29, 732, 761, 766-67.

---

[2] "AR" refers to the administrative record below, filed at Docs. 8-2 to 8-9.

After his release in July 2011, Dyslin lived with his sister for about a year, until his arrest on burglary charges. AR 246, 264. As a result of the burglary, he was incarcerated for three years. AR 246. During his imprisonment, providers diagnosed him with bipolar disorder and impulse control disorder, as well as antisocial personality disorder. AR 302, 439. They prescribed various antipsychotic medications to treat Dyslin's mental health. *See* AR 317-19. They believed that medication improved Dyslin's mental health and that off medication, he was more irritable and threatening. AR 417, 423.

Dyslin filed the current application for SSI benefits on September 22, 2014, in anticipation of his release from prison. AR 12, 500. Upon his release in December 2014, he lived in homeless shelters in the Des Moines and Cedar Rapids areas. AR 247. It appears he stopped taking his medications,[3] and he reported spending the majority of his time going to the library and playing computer games, although he did attend a few appointments. AR 247, 638-40, 651-53, 655-58, 662-66.

In July 2015, he was kicked out of the homeless shelter where he had been residing after threatening a guard with a knife. AR 245. His father took him to the emergency

---

[3] The ALJ noted that the record reflects Dyslin "told providers he was remaining compliant with all medications" at appointments in January and March 2015, but in May 2015, he reported he had stopped taking medications in December 2014; the ALJ did not resolve this apparent conflict. AR 19. A treatment note from December 30, 2014, (unacknowledged by the ALJ) reflects Dyslin reported he had not taken medications for five days (although it is unclear whether he was referring to all medications or just his cholesterol medications). AR 664. The treatment note from January 2015 relied upon by the ALJ reflects Dyslin reported he "was on psych[] meds" (past tense) when discussing the history of his illness, but not that he was currently taking medication: the treatment note lists "no known medications," notes Dyslin "[h]as stopped all mental health meds," and concludes that Dyslin should "consider going back on the bipolar meds." AR 656, 658. Dyslin did report that he was taking all prescribed medications in March 2015, but the mental status examination from that date is also one of his worst, reflecting (among other things) a disheveled appearance and poor hygiene; an anxious and depressed mood; a thought process reflecting loose associations; and poor insight and judgment. AR 652-53. As the ALJ noted, in June 2015, Dyslin reported he had stopped taking his medications in December 2014 (AR 640) and upon his hospitalization in July 2015, he initially refused medications and stated he did not need to be on them (AR 245, 256).

room, and he remained hospitalized for eleven days, until his commitment (per court order) to the Independence Mental Health Institute for three months. AR 182, 245, 669, 673-75. At both the hospital and the Independence Mental Health Institute, providers diagnosed Dyslin upon discharge with borderline intellectual functioning, a personality disorder, and an "Axis I" diagnosis—the hospital providers' Axis I diagnosis was paranoid schizophrenia, while the Mental Health Institute providers' Axis I diagnosis was "mood disorder" not otherwise specified (mood disorders include bipolar disorder, but not schizophrenia). AR 255, 258, 674.

Upon Dyslin's discharge from the Mental Health Institute on October 19, 2015, he remained under an outpatient mental-health committal, and he was released for supervised living with Cedar Valley Community Support. AR 673-75, 792. Through this arrangement, Dyslin lived in an apartment by himself, but staff stored his medications at the office and visited Dyslin three to four days a week for one to two hours. AR 46, 54, 787. Staff helped manage his medications (and ensured he remained compliant), gave him reminders about his personal hygiene, took or traveled with him by bus to appointments and grocery shopping, helped him communicate with providers, and assisted in scheduling appointments and obtaining a monthly bus pass. AR 48-51, 797-801. Dyslin remained under an outpatient committal and continued to receive support from Cedar Valley Community Support through the date of the disability hearing in January 2017. AR 46.

Dyslin's SSI application was denied initially in January 2015 and upon reconsideration in February 2015 (prior to his commitment to the Mental Health Institute). AR 70-89. Dyslin requested review by an ALJ, who held a hearing on January 25, 2017. AR 29. Dyslin; Sarabeth Tschantz, Dyslin's caseworker for Cedar Valley Community Support; and a VE testified at the hearing. AR 29, 791. On March 13, 2017, the ALJ issued a written opinion following the familiar five-step process outlined

in the regulations[4] to find Dyslin was not disabled during the relevant time period of September 22, 2014, to the date of the opinion.  AR 12-23.  The ALJ found that Dyslin suffered from the following severe impairments:  schizophrenia, bipolar disorder, borderline personality disorder, antisocial personality disorder, and impulse control disorder.  AR 14.  To evaluate whether Dyslin's impairments prevented him from performing his past work or other work (at steps four and five), the ALJ determined Dyslin's residual functional capacity (RFC)[5] and found he could perform work at all exertional levels, but with the following mental limitations:

> [H]e could have no more than occasional interaction with supervisors, coworker[s], and the general public.  He could no more than occasionally deal with requests, suggestions, criticism, or correction.  He should not be required to maintain sustained focus, attention, and concentration for more than two hours at a time.  He should not be required to set his own goals or make his own work plans independently.  He could not be required to always maintain appropriate personal hygiene and work attire.

AR 16.  Relying on the VE's testimony, the ALJ found that a person with Dyslin's RFC, age, education, and work experience could work as a hand packager, hospital cleaner, or industrial cleaner.  AR 22.  Thus, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [Dyslin] can perform."  AR 22.

The Appeals Council denied Dyslin's request for review on November 28, 2017 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.  *See* **20**

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work."  ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 416.920(a)(4)**.  The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists."  ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

[5] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." ***Lewis v. Barnhart***, 353 F.3d 642, 646 (8th Cir. 2003) (quoting ***Bradshaw v. Heckler***, 810 F.2d 786, 790 (8th Cir. 1987)).

**C.F.R. § 416.1481**. Dyslin filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Doc. 1). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 11, 15, 17), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Dyslin argues that the ALJ erred at step five in relying on the VE testimony to determine that significant amounts of work exist that Dyslin could perform. Doc. 11 at 3-6. Dyslin also argues that "overwhelming evidence shows [Dyslin] is unable to function outside of a highly structured, supportive, environment." *Id.* at 6-8. Finally, Dyslin argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution. *Id.* at 9-13.

### A. VE Testimony

If a claimant cannot perform his past work (or has none), the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy (either in the region where [the claimant] lives or in several regions in the country)." **20 C.F.R. § 416.960(c)(1)**. The Commissioner bears the burden of

6

proving that jobs exist in significant numbers that someone with the claimant's age, education, work experience, and RFC can perform. *See Gann v. Berryhill*, 864 F.3d 947, 952 (8th Cir. 2017); **20 C.F.R. § 416.960(c)(2)**. The Commissioner may meet this burden through testimony by a VE, but "VE testimony that conflicts with the [Dictionary of Occupational Titles (DOT)] 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden" if the inconsistency is unexplained by the VE. *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014).

> Under Social Security Regulation (SSR) 00-4p, the ALJ must "ask about any possible conflict" between VE evidence and "information provided in the DOT." . . . If there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information."

*Id.* at 989-90 (alterations in original) (quoting **SSR 00-4p**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000)).

Here, Dyslin does not argue that the VE's testimony conflicts with the DOT. Instead, Dyslin argues that the VE's testimony conflicts with the O*NET. Both the DOT and O*NET are published by the Department of Labor and contain occupational information, but the O*NET contains more current information (the DOT was last updated in 1991). *See Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010); *Wennersten v. Colvin*, No. 12-cv-783-bbc, 2013 WL 4821474, at *4 (W.D. Wis. Sept. 10, 2013).

Dyslin relies on cases in which courts upheld a VE's reliance on the O*NET instead of the DOT. *See Wennersten*, 2013 WL 4821474, at *4-5; *Jordan v. Astrue*, No. 4:08CV3217, 2009 WL 3380979, at *6 (D. Neb. Oct. 21, 2009), *aff'd*, 390 F. App'x 611 (8th Cir. 2010) (per curiam). These cases do not stand for the proposition that it is error for a VE to rely on the DOT instead of the O*NET or that the ALJ must resolve conflicts with the O*NET. Dyslin also points to a Sixth Circuit case in which the court rejected the VE's reliance on the DOT "[i]n light of the fact that more current job

7

descriptions were available . . . and that the two [DOT positions] relied on by the VE are not found in O*NET." *Cunningham*, 360 F. App'x at 616. Dyslin also points to a decision from a district court in the Sixth Circuit holding, in reliance on *Cunningham*, that the VE erred in relying on the DOT descriptions from 1977 and 1980 for two positions when one of the positions was not listed in the O*NET and the other DOT position "indicate[d] a substantially [lower] level of specific vocational preparation than" its description in the O*NET (the O*NET indicated the position's "specific vocational preparation" was between 4 and 6, while the DOT indicated it was a 2). *Johnson v. Berryhill*, No. 4:16-CV-00106-HBB, 2017 WL 2454326, at *7-10 (W.D. Ky. June 6, 2017), *reconsideration denied*, 2017 WL 4542228 (Oct. 11, 2017).

Here, the VE testified (and the ALJ found) that a person with Dyslin's RFC (minus the personal-hygiene limitations) could work as a hand packager (DOT 920.587-018), a hospital cleaner (DOT 323.687-010), or an industrial cleaner (DOT 381.687-018) and that 40,000 of each of these positions exist nationally. AR 22, 65. Dyslin argues that according to the O*NET, 94% of the housekeeping positions require more than occasional contact with others (and are thus, outside the scope of his RFC). He relies on the O*NET entry for "Maids and Housekeeping Cleaners, 37-2012.00," which encompasses the DOT "hospital cleaner" position, as well as nine other DOT positions, including a butler position, "laundry worker," and "caretaker" (but not the DOT "industrial cleaner" position—that position is instead covered by the O*NET entry for "Janitors and Cleaners, Except Maids and Housekeeping Cleaners, 37-2011.00").[6] The

<hr>

[6] **Custom Report for 37-2012.00 – Maids and Housekeeping Cleaners**, O*NET, https://www.onetonline.org/link/summary/37-2012.00 (from "Custom" tab, check "Work Context" and select "all" and "0" from the Work Context drop-down menus; check "Crosswalk" and select "all" and "DOT" from the Crosswalk drop-down menus; and check "Wages & Employment"; then follow "Go" hyperlink); **Custom Report for 37-2011.00 – Janitors and Cleaners, Except Maids and Housekeeping Cleaners**, O*NET, https://www.onetonline.org/link/summary/37-2011.00 (from "Custom" tab, check "Work Context" and select "all" and "0" from the Work Context drop-down menus; check "Crosswalk"

O*NET entry for 37-2012.00 indicates that a total of 1,443,000 positions exist nationwide and that 96% of those positions require more than occasional contact with others, 3% of those positions require occasional contact, and 2% require no contact.[7]

Thus, unlike the cases from the Sixth Circuit that Dyslin relies on, here, the DOT position the VE testified Dyslin could perform is still listed in the O*NET. Moreover, the O*NET description and the VE's testimony do not directly conflict: the O*NET indicates that 5% of 1,443,000 positions (or 72,150 positions) require no or occasional contact with others, and because the O*NET groups multiple DOT positions together, all 40,000 DOT "hospital cleaner" positions could be part of the 5% of O*NET positions that require no more than occasional contact with others.

The Eighth Circuit's requirement that the ALJ resolve conflicts between VE testimony and the DOT stems from SSR 00-4p, which provides that "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." 65 Fed. Reg. at 75,760. As other courts have noted, there is no similar requirement that an ALJ resolve conflicts between the O*NET and the VE's testimony. *See Valentin v. Berryhill*, No. 3:17cv944(DFM), 2018 WL 4300119, at *10 (D. Conn. Sept. 9, 2018); *Cooley v. Colvin*, No. CIV. 13-5307, 2015 WL 1119973, at *5-6 (W.D. Ark. Mar. 12, 2015). And although some caselaw from the Sixth Circuit supports that an ALJ errs by relying on the DOT when it conflicts with the O*NET, that is not the situation here. Because the VE's testimony (and the DOT description of positions) is not in direct conflict with the O*NET, I recommend rejecting Dyslin's argument that the ALJ erred in relying on

---

and select "all" and "DOT" from the Crosswalk drop-down menus; and check "Wages & Employment"; then follow "Go" hyperlink).

[7] **Custom Report for 37-2012.00**, O*NET, *supra* note 6.

the VE's testimony that a person limited to occasional contact with others can work as a hospital cleaner.

Dyslin also argues that the VE's testimony does not support that a person with his personal-hygiene limitations can work as an industrial cleaner, hospital cleaner, or hand packager, as found by the ALJ. For the VE's testimony to support the ALJ's step-five determination, it must be "based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)). "An ALJ's reliance on a [VE's] testimony is improper if the [VE] substantially changes the hypothetical beyond the ALJ's instructions." *Travis v. Astrue*, 477 F.3d 1037, 1043 (8th Cir. 2007); *cf. Long v. Chater*, 108 F.3d 185, 188–89 (8th Cir. 1997) (holding that the VE testimony supported the ALJ's step-five determination because the VE was not "hedging or giving qualified responses").

Here, the ALJ asked the VE if a hypothetical person with Dyslin's RFC, including someone who would not always be able to "maintain appropriate personal hygiene or work attire," could perform work in the national economy. AR 66. The VE responded that "the question of clothing or hygiene would be an issue of whether or not it was offensive or not." *Id.* When the ALJ responded, "Understood," the VE elaborated: "So, if there's a correction to be made and there's a standard by the employer that says, you have so many reprimands based on my request and/or hygiene, then I believe once the -- if it's offensive to the other workers then it would eliminate positions, otherwise, I do not see it as a factor . . . . Those positions would remain as previously identified." *Id.* Dyslin argues that the VE's testimony does not support the ALJ's RFC determination because the ALJ did not resolve whether Dyslin's personal hygiene would offend others.

I agree (although I find it to be a close issue). I recognize that in *Travis*, the Eighth Circuit found the VE's testimony supported the ALJ's determination, even though it could have been clearer. 477 F.3d at 1043. In that case, the ALJ asked whether the claimant's "poor ability to follow work rules" would affect her ability to work as a

10

cashier.  *Id.*  The VE responded, "normally I would say yes[,] except she has fair ability to follow simple instructions and it's an unskilled job."  *Id.*  The VE further elaborated that the cashier position "would require a level of attention and concentration," so "there could be an issue there if that in and of itself would be enough to keep a person from performing that job."  *Id.*  The court found this testimony supported the ALJ's step-five determination because "[t]he expert did not change the hypothetical question or rely on criteria not mentioned by the ALJ"; rather, the VE "stated his opinion and then raised an issue for the ALJ's consideration."  *Id.*  The court specifically noted that "the ALJ did not find that [claimant] suffered . . . attention and concentration limits," so "the expert's equivocal response d[id] not contradict his prior response to the ALJ's hypothetical."  *Id.*

Here, on the other hand, the VE changed the hypothetical by adding that the hypothetical person's inability to always maintain personal hygiene would not be "offensive" to others.  The ALJ did not specify in the decision the degree of Dyslin's personal-hygiene issues (are they nonoffensive?).  *See Vail v. Barnhart*, 84 F. App'x 1, 2, 4 (10th Cir. 2003) (holding that VE's testimony did not support ALJ's step-five determination when VE testified no positions existed for a person that "would have to alternate sitting and standing as needed"; but that positions existed if the "brief changes of position" were not "as needed"; and the ALJ found the claimant needed "brief changes of position" without specifying "how often [the claimant] would need to change positions").  Nor did the ALJ ask the VE to elaborate on what he meant by offensive— Would some people be "offended" by a worker's bad body odor?  Would it depend on the job the worker was doing?  Would it depend how often the person had to interact with the worker?  The VE here also suggested that by "offensive," he simply meant in violation of the employer's standards and subjecting the person to reprimand, although it is not entirely clear (and presumably, not wearing appropriate work attire would violate standards).  I find the VE's testimony here is distinguishable from *Travis* and amounts to

11

a "qualified response" or change to the hypothetical. Thus, I recommend holding that the VE's testimony does not support the ALJ's step-five determination.

### B. *Dyslin's Ability to Function Outside of a Structured, Supportive Environment*

Dyslin argues that the record as a whole establishes that he cannot function outside of a structured, supportive environment and that therefore, this case should be remanded for an award of benefits. As the Commissioner notes, it is not entirely clear whether Dyslin argues that the ALJ's RFC determination should have included additional limitations, or whether Dyslin instead argues that the ALJ erred at a different step of the sequential process—Dyslin points to a brief he submitted to the ALJ after the hearing, in which he made a similar argument to support that he met Listing 12.03 and Listing 12.08. Doc. 11 at 6-7; AR 290-92.

The ALJ did not address whether Dyslin met the "paragraph A" criteria for Listing 12.03, the listing for schizophrenia, or Listing 12.08, the listing for personality and impulse-control disorders. AR 15. Instead, the ALJ found that Dyslin did not meet either listing because the listing's other requirements were not satisfied. *Id.* In addition to demonstrating the existence of the paragraph A criteria, to meet Listing 12.03, a claimant must meet either the paragraph B or the paragraph C criteria; and to meet Listing 12.08, the claimant must meet the paragraph B criteria. *See* **20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.03**, **12.08**.[8] The paragraph B criteria for both Listings require marked limitations in two of the following categories (or an extreme limitation in one): (1) understanding, remembering, or applying information, (2) interacting with others,

---

[8] Dyslin does not appear to challenge the ALJ's application of the new listings that went into effect on January 17, 2017, after Dyslin filed his SSI application but before the ALJ issued his decision. *See* **Revised Medical Criteria for Evaluating Mental Disorders**, 81 Fed. Reg. 66138, 66130 & n.1 (Sept 26, 2016) (noting that "the final rules . . . apply . . . to claims that are pending [before the Social Security Administration] on or before the effective date" and that "[the Social Security Administration] expect[s] that Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions"); AR 15-16.

12

(3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. *Id.* §§ **12.03(B), 12.08(B).** The ALJ found that Dyslin suffered marked limitations in interacting with others, but no greater than moderate limitations in the other categories. AR 15. The paragraph C criteria for Listing 12.03 require "a medically documented history of the existence of the disorder over a period of at least 2 years," as well as evidence of both "a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder" and evidence of the claimant's "marginal adjustment." **20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(C).** The ALJ found Dyslin did not meet the "paragraph C" criteria because "[t]he record does not establish a medically documented history of a 'serious and persistent' disorder, lasting for a period of at least two years." AR 15. Dyslin does not challenge this finding on appeal. Thus, even if the ALJ made an error in evaluating Dyslin's ability to function outside of a structured environment, Dyslin would still not meet the paragraph C criteria for Listing 12.03. But Dyslin's argument that the ALJ failed to fully consider his need for a structured, supportive environment bears on the magnitude of his limitations in "adapting or managing [him]self," which is relevant to whether he meets the paragraph B criteria for Listings 12.03 and 12.08.

The regulations define "adapting or managing oneself" as "refer[ring] to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting,"—for example, in "[r]esponding to demands; adapting to changes; managing . . . psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for [one]self independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." **20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E(4).** The regulations note that when considering whether a claimant meets a listing for a mental impairment, the ALJ should consider the "effects of support, supervision, [or] structure on functioning":

13

The degree of limitation of an area of mental functioning also reflects the kind and extent of supports or supervision [the claimant] receive[s] and the characteristics of any structured setting where [the claimant] spend[s his] time, which enable [the claimant] to function. The more extensive the support [the claimant] need[s] from others or the more structured the setting [the claimant] need[s] in order to function, the more limited [the Social Security Administration] will find [the claimant] to be.

*Id.* § 12.00F(3)(e).

Here, the ALJ rejected Cedar Valley Community Support caseworker Tschantz's "opinion that the claimant would not be able to function in society without staff support," finding it "not consistent with other parts of her own testimony or other evidence of record." AR 17. Although Dyslin does not appear to challenge the weight the ALJ assigned Tschantz's testimony,[9] I agree with Dyslin that substantial evidence does not support the ALJ's overall conclusion that Dyslin could function in society (or hold gainful employment) without assistance from a supportive living community (or similar).

In making his finding to the contrary, the ALJ relied heavily on an October 2016 treatment plan from Tschantz in which she noted that Dyslin is an "intelligent and mostly independent person." AR 17, 794. The ALJ failed to acknowledge that in that same treatment plan, Tschantz noted that Dyslin admitted he would "not manage his

---

[9] Dyslin relies on Tschantz's testimony, but he does not appear to challenge the ALJ's failure to fully credit Tschantz's opinion. *See* Doc. 11. Substantial evidence supports the ALJ's overall conclusion that parts of Tschantz's testimony were inconsistent with the overall record (AR 17), which is an appropriate reason to discount any source's opinion. *See Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007). For example, Tschantz testified that if a staff member did not go grocery shopping with Dyslin, she believed that Dyslin would shoplift to avoid interacting with the cashiers and noted it has "historically . . . [been] a problem." AR 50. In a treatment plan Tschantz filled out in October 2016, however, she noted that Dyslin "has alluded to stealing items in the past," but "[t]his is not known to be a current issue in [Dyslin's] life" (the treatment plan suggests that Dyslin would have difficulty shopping by himself, but because he would likely purchase cigarettes over necessities like food or hygiene items, not because of shoplifting). AR 793, 795. The November 2014 third-party function report from Dyslin's father also notes that he is technically able to shop in stores, although he "wants to buy time foolishly" and "wants to look at everything" and "[cannot] be trusted" to go out alone (but does not specifically mention shoplifting). AR 222.

medications" without help and that a "goal" for the next year was for Dyslin to attend mental and physical health appointments by himself. AR 792, 797. The treatment plan further reflects that staff assisted Dyslin in numerous ways related to health appointments, including scheduling and tracking appointments, making a list of things to discuss with providers, obtaining a monthly bus pass for Dyslin, reviewing with Dyslin how to travel by bus to appointments, traveling to appointments with Dyslin, and helping him communicate with providers. AR 797-98. More than once, Tschantz noted in the treatment plan that Dyslin suffers from poor decision-making, including ending appointments with staff early, refusing to participate in therapy, and purchasing cigarettes over necessities. AR 793, 795. The treatment plan also reflects that Dyslin's intelligent quotient (IQ) was 70, which qualifies as "borderline intellectual functioning," and that Dyslin's Global Assessment of Functioning (GAF) score was 25.[10] AR 793. Viewed as a whole, the treatment plan does not support that Dyslin would be able to function in society without staff support.

---

[10] A GAF score is an examining clinician's score out of 100 assessing "an individual's social, occupational, and psychological functioning." *Mortensen v. Astrue*, No. CIV. 10-4976 (JRT/JJG), 2011 WL 7478305, at *2 n.4 (D. Minn. Sept. 30, 2011) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM) 32-33 (4th ed. 1994) (DSM-IV)), *report and recommendation adopted*, 2012 WL 811510 (Mar. 12, 2012). "GAF scores of 21-30 indicate that one's behavior is considerably influenced by delusions or hallucinations or serious impairments in communications or judgment in almost all areas." *Id.* at *2 n.5. The fifth edition of the DSM (DSM-V), published in 2013, abandons the GAF scale "because of its 'conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.'" *Bates v. Colvin*, No. 2:13 CV 99 DDN, 2014 WL 4439990, at *9 (E.D. Mo. Sept. 9, 2014) (quoting **DSM-V** 16). During the relevant time period, Dyslin's GAF score ranged from 25 at the low end to "61-70" at the high end (AR 423, 501, 621, 640, 670, 672, 675, 793); "[a] GAF score of 61-70 indicates the individual has some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupation, or school functioning (e.g., occasional truancy, or theft within the household), but is generally functioning pretty well and has some meaningful interpersonal relationships," *Lopez v. Colvin*, 959 F. Supp. 2d 1160, 1165 n.2 (N.D. Iowa 2013) (citing **DSM-IV** 34). The ALJ gave "little weight" to all GAF scores. AR 19-20.

The ALJ also relied on the amount of support Dyslin receives, noting he "resides independently in his own apartment and, other than meeting with a staff member for two hours during the weekdays, he is otherwise on his own for the remainder of the time, which is well over 90% of the time each week." AR 17. That Dyslin is able to function by himself 90% of the time does not constitute substantial evidence for the ALJ's conclusion that Dyslin could function outside of a structured setting, as the overall record overwhelmingly supports that without the assistance he receives in medication management, Dyslin would be disabled.

As the ALJ noted, during Dyslin's incarceration for burglary from 2012 to December 2014, providers regularly noted limitations in Dyslin's insight into his mental health, as well as in his judgment (although not always). AR 18, 422, 438, 442, 448, 454, 472-73, 476, 500, 503-04, 508, 516, 521, 532, 534, 540, 544, 546, 621. Once released, providers continued to note poor insight (when Dyslin was not taking medication) or fair insight (when Dyslin was taking medication). *See* AR 248, 639, 642, 644, 647, 652, 670.

Upon his release from prison, Dyslin stopped taking medication. *See supra* note 3. He did not begin taking medication again until he was hospitalized under a court-ordered commitment. *See* AR 256. When he was first hospitalized, Dyslin refused medications, telling providers that he did "not believe he has any significant mental illness," that he had no known psychiatric diagnosis (although admitted a prior diagnosis as a sociopath), and that he did not need medications or psychological treatment. AR 245, 249, 256, 669. Although Dyslin continued to take his medications after being released from inpatient commitment, he remained under an outpatient mental-health committal (through at least the date of the hearing) "requiring him to continue to receive psychiatric treatment and remain medication compliant." AR 45-46, 787, 792. Because of this outpatient commitment, staff from Cedar Valley Community Support ensure that Dyslin takes his medications and attends mental-health appointments by storing Dyslin's medications at their office and supervising their administration, scheduling appointments,

16

and attending appointments with Dyslin. AR 51, 796-797. Even with encouragement and on medication, Dyslin occasionally ends time with the Cedar Valley Community Support staff early, and he refuses to attend therapy. AR 793, 795.

A treatment note from a prison provider in July 2014 indicates that Dyslin "needs encouragement to be[ ]on [medications]." AR 423. In September 2014, Dyslin reported that he was "not sure what [his medications] are doing," and a provider had to discuss the benefits of medication with Dyslin. AR 417-18. In November 2014, Dyslin's father reported that Dyslin needs reminders to take medications. AR 221. A treatment note from May 2015 (prior to Dyslin's commitment) reflects that Dyslin "does not want to seek medication but it is likely necessary." AR 640. Tschantz testified that without staff support, Dyslin would not attend mental-health appointments, as he lacks "understanding of the consequences" of missing appointments or lacks "acceptance of the consequences." AR 56-57. She further testified that she was "not saying he wouldn't know how to do it," but that he would choose not to go. AR 56. Dyslin's poor judgment, such as choosing to purchase cigarettes over necessities like hygiene items or food (AR 795), also suggests that he might choose not to spend money on medications if left unsupervised (indeed, Tschantz testified that when Dyslin was unable to pay for his medications in spring 2016, he decided not to take them, and staff had to work to obtain funding to pay for them (AR 47)). The overwhelming evidence of record reflects that on his own, Dyslin would not take medications or regularly receive mental-health treatment.

Treatment notes from Dyslin's time in prison reflect the consequences of Dyslin's failure to take medications. In May 2014, when Dyslin had stopped taking medications for at least a week, the provider noted that his "energy [was] up," that he was "talking more and rambling and repeating," that he had grandiose delusions, and that his refusal of medications "[wa]s showing in decompensation [and] increased irritability." AR 431-33, 506. A provider further noted that Dyslin's mental status was "mild[ly]" deteriorating and that the provider was considering civil commitment if Dyslin continued to refuse medications. AR 506-07. A later treatment note from May 2014 shows that

17

Dyslin reported he "got angry" when he was not on medications. AR 504. A July 2014 treatment note indicates "off medication he was extremely different[,] including threatening to staff," but with medication "he has shown improvement." AR 423. Dyslin admitted in September 2014 that he was irritable when off his medications earlier in the year, and the provider noted that after reviewing treatment notes, Dyslin has "periods of non-compliance," and "irritable was noted more prominent after he was off meds." AR 417.

Providers' objective evaluations of Dyslin's mental-health status during his period of noncompliance with medication upon his release from prison also demonstrate Dyslin's need for medication. As the ALJ noted, "when compliant [with medications], [Dyslin's] mental status was noted to be stable," and examinations "were generally unremarkable, except for poor judgment and insight." AR 18; see also, e.g., 642, 644, 647, 671-72. But in January 2015, when Dyslin had been released from prison but not yet committed (and was not taking medication), a provider noted poor judgment and insight, anxious mood and affect, slow speech, and poor dental hygiene. AR 657. In March 2015, Dyslin's answers to a test used to measure depression indicated severe, major depression, and the provider noted disheveled appearance; poor hygiene; candid, guarded, and passive "attitude and behavior"; poor eye contact; agitated, rigid, and slowing motor activity; hesitant, monotone, slow, and slurred speech; anxious, depressed, and worried mood; anxious, blunted, constricted, depressed, and manic affect; clouded sensorium; loose associations in his thought and perception; poor insight; and poor judgment. AR 651-53. The provider concluded that Dyslin "suffers from severe mental health issues." AR 653. In June 2015, Dyslin's mental-health status had improved, but it was still worse than when he takes medication: the provider noted good grooming and hygiene, appropriate affect and behavior, good eye contact, and normal speech, but mood "a little anxious," poor thought processes and perceptions, and poor insight and judgment. AR 639. In July 2015, Dyslin threatened a guard at the homeless shelter with a knife. AR 245, 256. His father took him to the hospital, and upon his admission, Dyslin "was very

18

threatening verbally"; refused vitals; exhibited aggressive behavior, agitation, and irritability; and had an "intense and guarded affect," but he improved upon involuntary commitment and receiving antipsychotic medications. AR 245, 248-49, 256, 259; *see also* AR 19 (ALJ noted Dyslin improved over ensuing months after being committed and receiving medication). The record as a whole overwhelmingly demonstrates that without medications, Dyslin's mental health would deteriorate to a point where he would not be able to work. Even the state agency consultants' opinions relied upon by the ALJ based their conclusion of Dyslin's RFC on his "ongoing compliance" with medication. AR 77, 87. Substantial evidence does not support the ALJ's conclusion that Dyslin would "be able to function in society without staff support" (AR 17), as any time Dyslin has been on his own, he has refused medications and other mental-health treatment, his mental health has deteriorated, and he has ultimately ended up in prison or under a civil commitment.

As the ALJ noted, Dyslin spends most of his time playing video games, watching movies, and walking to the library. AR 16-17, 21, 39, 41, 210, 247, 640, 804. He is able to clean his apartment and care for his personal hygiene, but he needs reminders to do both. AR 40-41, 220-21, 786, 794-95, 801-02. He prepares his own meals. AR 21. He does laundry at his father's house with his father's assistance. AR 39-40. He needs someone to accompany him (his father or support staff) when he goes grocery shopping. AR 39-40, 48, 50-51, 222. In October 2016, Dyslin's goals to work on with support staff included "successfully attend[ing] at least one community activity a year" and "complet[ing] [activities of daily living] without reminders," including "remembering to turn burners off on the stove." AR 800, 806. Sometime in 2015, Dyslin allowed some friends to stay in his apartment (in violation of his lease), and when he wanted them to leave, he ultimately had to call the police. AR 48-49, 795.

The "quality" and degree of "independence" of Dyslin's activities of daily living must be considered, and his activities do not necessarily demonstrate the ability "to perform the requisite [work] acts day in and day out, in the sometimes competitive and

19

stressful conditions in which real people work in the real world." ***Reed v. Barnhart***, 399 F.3d 917, 923 (8th Cir. 2005) (quoting ***Thomas v. Sullivan***, 876 F.2d 666, 669 (8th Cir. 1989)). Although Dyslin is "generally independent" in the supportive environment in which he lives (AR 20), the record overwhelmingly supports that the help he receives is vital to his ability to function. The ALJ noted that he "is mindful the claimant has been residing within a supportive living environment since October of 2015" when determining Dyslin's RFC, but the ALJ appeared to give this fact no weight, as he found an opinion that Dyslin could not function without staff support "not consistent with . . . other evidence of record" and emphasized Dyslin's independence in his activities of daily living.[11] AR 17, 19-20.

The ALJ erred when he found that Dyslin did not require a supportive living environment to function. I recommend remanding this case for the ALJ to further

---

[11] I further note the ALJ relied on his finding that Dyslin can "properly use and navigate public transportation." AR 21. The ALJ offers no citation to the record in support of this proposition, and the evidence appears to support a contrary finding (the ALJ perhaps relied on the state agency consultants' notation in January and February 2015 that there was "no evidence" Dyslin was limited in his ability to use public transportation (AR 76, 86)). Dyslin's father's third-party function report from November 2014 indicates that Dyslin travels by walking, riding in a car, or biking, but not by public transportation (it also indicates he does not go out alone "because he can not be trusted"). AR 221. The October 2016 treatment plan notes that staff review bus routes with Dyslin and assist Dyslin with obtaining a bus pass, as well as travel with Dyslin by bus to appointments when time allows (otherwise, they drive him to appointments). AR 798. The treatment plan also indicates that if Dyslin chose to return to work, he "would face . . . transportation barriers." AR 795. Tschantz testified at the hearing that Dyslin is "capable of riding the bus," but he sometimes calls the office needing staff assistance because he does not know where he is or what bus to get on; she also testified that if staff did not accompany Dyslin to appointments, he would not go, but because he would not understand the consequences, not because "he wouldn't know how to do it." AR 49-50, 56-57.

The ALJ also relied on an incident in which Dyslin had allowed people to stay in his apartment, in violation of his lease, and then called the police to get them to leave, which the ALJ concluded demonstrated "good social judgment." AR 21. I question whether this incident, when viewed as a whole, demonstrates good judgment (Tschantz gave it as an example of Dyslin's poor judgment). AR 48-49. In any event, as already discussed, most other evidence in the record (including mental status examinations) indicates Dyslin suffers limitations in judgment.

consider the effects of Dyslin's living in a structured setting on his ability to "adapt or manage [him]self" for purposes of meeting a listing; I would direct the ALJ to more fully explain his findings as it relates to that requirement (for example, by setting forth analysis regarding the factors in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E(4)). I also recommend requiring the ALJ to further consider and explain what effects, if any, Dyslin's limits in his activities of daily living and living in a structured setting have on his ability to function in the workplace (RFC).

I do not recommend remanding for an award of benefits, as requested by Dyslin. Although the record overwhelmingly supports that Dyslin would be disabled without medication and without the help he receives from Cedar Valley Community Support, I do not find that the record "overwhelmingly" supports a finding of disability when Dyslin is compliant with medication. The better course of action is for the ALJ to further consider the effects of Dyslin's need for a structured supportive environment to live on his ability to adapt or manage oneself and on his RFC.

### C. Appointments Clause Challenge

The Appointments Clause of the Constitution requires that principal officers be appointed by the president with the advice and consent of the Senate and that inferior officers be appointed by "the President alone, . . . the Courts of Law, or . . . the Heads of Departments." **U.S. Const. art. II, § 2, cl. 2**; *see also Lucia*, 138 S. Ct. at 2051 & n.3. The Appointments Clause does not apply to "non-officer employees—part of the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051.

The Supreme Court recently held in *Lucia* that the five ALJs for the Securities and Exchange Commission (SEC) are "inferior officers" subject to the Appointments Clause, as they "exercise[] significant authority pursuant to the laws of the United States." *Id.* The Court relied on *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which it held special trial judges of the United States Tax Court were inferior officers subject to the

Appointments Clause, noting that both SEC ALJs and Tax Court special trial judges: (1) serve career appointments "to a position created by statute, down to its 'duties, salary, and means of appointment'"; (2) take testimony during hearings and may take pre-hearing depositions; (3) administer oaths, rule on motions, and generally regulate the court during a hearing; (4) rule on the admissibility of evidence, (5) have the power to enforce compliance with discovery, including to punish contempt by excluding people from the court room, and (6) issue opinions detailing factual findings and legal conclusions and ordering appropriate remedies. 138 S. Ct. at 2052-54 (quoting *Freytag*, 501 U.S. at 878). The Court ordered that the petitioner receive a new administrative hearing from a properly appointed official, noting that the petitioner "timely challeng[ed]" the validity of the appointment before the administrative agency. *Id.* at 2055. The petitioner had not raised the Appointments Clause challenge to the ALJ at any point during the "nine days of testimony and argument," but after the ALJ rendered an unfavorable decision, the petitioner appealed to the SEC and argued "that the administrative proceeding was invalid because [the ALJ] had not been constitutionally appointed." *Id.* at 2050.

Dyslin argues that following the reasoning of *Lucia*, Social Security ALJs are inferior officers subject to the Appointments Clause. Dyslin did not challenge the validity of the ALJ's appointment at any point during the administrative proceedings. Therefore, the Commissioner argues that Dyslin has forfeited his Appointments Clause challenge.

Dyslin suggests that issue exhaustion is not required in proceedings before the Social Security Administration, relying on language from *Sims v. Apfel*, 530 U.S. 103 (2000). In *Sims*, the Supreme Court held that claimants must exhaust administrative remedies by requesting review before the Appeals Council, but they "need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues." 530 U.S. at 112 (plurality opinion); *id.* at 114 (O'Connor, J., concurring). The Court noted it was "common for an agency's regulations to require issue exhaustion in administrative appeals," but the Social Security regulations did not do so. *Id.* at 108 (majority opinion). The Court declined to impose a judicially created

22

issue-exhaustion requirement before the Appeals Council, relying in large part on the "inquisitorial rather than adversarial" nature of Social Security proceedings.  *Id.* at 111 (plurality opinion).  The Court specifically noted it did not address "[w]hether a claimant must exhaust issues before the ALJ."  *Id.* at 107 (majority opinion).

The Commissioner points to several cases suggesting that a claimant forfeits arguments related to whether he is disabled by failing to raise them at any point during the administrative proceedings, including before the ALJ (at least when the claimant is represented by counsel).  *See Shaibi v. Berryhill*, 883 F.3d 1102, 1108-10 (9th Cir. 2017) (holding that claimant forfeited argument that VE's testimony conflicted with handbooks containing occupational data because claimant's attorney failed to ask VE "the evidentiary basis for his [job number] estimates" and did not "cross-examine the VE as to the accuracy of those estimates, or challenge that accuracy before the Appeals Council"); *Mills v. Apfel*, 244 F.3d 1, 8 (1st Cir. 2001) (suggesting that claimant waived argument that his prior, short-lived employment could not constitute "past work" by failing to mention it "to the ALJ or the Appeals Council"); *Day v. Colvin*, No. 1:15-CV-1615-DKL-TWP, 2016 WL 4607446, at *4 (S.D. Ind. Sept. 6, 2016) (suggesting that counsel's failure to object at hearing resulted in claimant's waiver of "any right to complain about the ALJ summarizing . . . two exhibits for" a medical expert that testified at the hearing, "rather than allowing the medical expert to review the exhibits himself before testifying"); *Stevens v. Comm'r of Soc. Sec.*, No. 2:14-CV-2186, 2016 WL 692546, at *12 (S.D. Ohio Feb. 22, 2016) (holding that claimant, who was represented by counsel at the hearing before the ALJ, waived argument that VE "mischaracterized" her past work by failing to "question or object to the VE's characterization"), *report and recommendation adopted*, 2016 WL 1156518 (Mar. 24, 2016); *Harhaw v. Colvin*, No. 1:12-CV-01776-BAM, 2014 WL 972269, at *2, *4 (E.D. Cal. Mar. 12, 2014) (holding that plaintiff waived argument that ALJ "err[ed] at step two . . . by failing to consider" certain impairments when claimant never "raise[d] [these] impairments . . . during the administrative proceedings"), *aff'd sub nom. Harshaw v. Colvin*, 616 F. App'x 316 (9th

Cir. 2015); *Greene v. Astrue*, No. 5:12-CV-00242-MP-EMT, 2013 WL 5434634, at *6, *8 (N.D. Fla. Sept. 27, 2013) (adopting report and recommendation) (noting that by failing to object at administrative hearing to report of contact detailing claimant's phone call to disability office, claimant waived "any objection to the admission of this evidence into the record," but that claimant "[wa]s not precluded from arguing against the ALJ's reliance on it"); *Spence v. Astrue*, No. 11-cv-2597-LTB, 2013 WL 61492, at *12 (D. Colo. Jan. 4, 2013) (holding claimant waived argument that his noncompliance with treatment should be excused based on his inability to pay when he did not designate "this as an 'issue' on appeal," challenge the ALJ's credibility determination (which was based on his failure to take his medications), or raise this issue to his treating physician or the Social Security Administration); *Avila v. Astrue*, No. 2:11-cv-400, 2012 WL 5831287, at *11 (N.D. Ind. Nov. 15, 2012) (rejecting claimant's challenge to the qualifications of the medical expert who testified at the hearing as untimely when claimant was represented by counsel at the hearing and "stipulated to the [expert's] qualifications," raising her objection for the first time on judicial review); *Rainwater v. Astrue*, No. 09-CV-486-PJC, 2011 WL 213460, at *9 (N.D. Okla. Jan. 21, 2011) (holding claimant waived argument that "ALJ should have called a medical examiner as a witness at the hearing," rather than relying on the expert's answers to interrogatories, when the claimant was represented by counsel at the hearings and did not object to the evidence nor request for the expert to attend the hearing in person); *Carvey v. Astrue*, No. 06-CV-0737 (NAM/DEP), 2009 WL 3199215, at *15 (N.D.N.Y. Sept. 30, 2009) (holding that claimant forfeited challenge to VE's credentials when counsel stated at the hearing that there were no objections to the VE's credentials), *aff'd*, 380 F. App'x 50 (2d Cir. 2010); *Smith ex rel. J.T.H. v. Astrue*, No. CIV A 1:07CV890-WC, 2008 WL 2559392, at *3 (M.D. Ala. June 24, 2008) (holding claimant waived argument that ALJ erred by failing to find she suffered from a certain impairment when claimant did not list the impairment in her disability application or otherwise mention this impairment before the ALJ or Appeals Council); *see also Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003)

24

(holding that by failing to "allege[] any limitation in function as a result of his obesity in his application for benefits or during the hearing," claimant waived argument that "ALJ failed to consider his morbid obesity as an impairment"); *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) (rejecting argument that ALJ "erred in failing to fully and fairly develop the evidence concerning [claimant's] depression" because claimant "did not allege depression in his disability application, and he did not mention the condition during his testimony"). None of the cases cited by the Commissioner involve the waiver or forfeiture of a constitutional argument, and none involve a structural challenge to the ALJ's ability to preside over the case.

In *Freytag*, the petitioners challenged the appointment of the special trial judge for the first time on judicial review—indeed, the petitioners had consented in the administrative proceedings to trial by a special trial judge. 501 U.S. at 871-72. Before the Supreme Court, they argued that Appointments Clause challenges as a class cannot be forfeited or waived. *Id.* at 893 (Scalia, J., concurring). The majority opinion did not address this argument, instead "exercis[ing] its discretion to consider" the Appointments Clause challenge (which it classified as a "nonjurisdictional structural constitutional objection[]"). *Id.* at 878-79 (majority); *id.* at 893 (Scalia, J., concurring). The Court noted the Appointments Clause challenge was "neither frivolous nor disingenuous" and went "to the validity of the Tax Court proceeding." *Id.* at 879 (majority). The Court therefore concluded this was "one of those rare cases in which [a court] should exercise [its] discretion." *Id.* The Eighth Circuit has interpreted *Freytag* as creating a discretionary rule in which "a reviewing court generally is permitted (though not obliged) to hear a belated appointments clause challenge." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013); *see also Jones Bros., Inc. v. Sec. of Labor, Mine Safety, & Health Admin.*, 898 F.3d 669, 677-78 (6th Cir. 2018) (excusing forfeiture of Appointments Clause challenge when the plaintiff noted a circuit split on the issue before the administrative agency but declined to "press" the issue; *Associated Mortg. Bankers, Inc. v. Carson*, No. CV 17-0075 (ESH), 2019 WL 108882, at *5, *7 (D.D.C. Jan. 4,

25

2019) ("utiliz[ing] its discretion to reach . . . Appointments Clause" challenge to United States Department of Housing and Urban Development ALJ that was not raised before agency).

Every court to address this issue (that I have found) has held that the claimant forfeited his *Lucia*-based Appointments Clause challenge by failing to raise it to the Social Security Administration, and the courts have declined to excuse the forfeiture. *See, e.g.*, *Valasquez ex rel. Valasquez v. Berryhill*, No. CV 17-17740, 2018 WL 6920457, at *2-3 (E.D. La. Dec. 17, 2018) (collecting cases), *report and recommendation adopted*, 2019 WL 77248 (Jan. 2, 2019); *Flack v. Comm'r of Soc. Sec.*, No. 2:18-CV-501, 2018 WL 6011147, at *3-4 (S.D. Ohio Nov. 16, 2018) (adopting report and recommendation) (collecting cases); *Stearns v. Berryhill*, No. C17-2031-LTS, 2018 WL 4380984, at *5 (N.D. Iowa Sept. 14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-cv-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018).[12]  The purpose of a forfeiture rule is to prevent "the practice of 'sandbagging':  suggesting or permitting, for strategic reasons, that the [agency] pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error." *Muiruri v. Lynch*, 803 F.3d 984, 987 (8th Cir. 2015) (quoting *Freytag*, 501 U.S. at 895 (Scalia, J., concurring)). Excusing a claimant's failure to raise an Appointments Clause challenge to the Social Security Administration could allow a claimant to game the system to obtain more than "one bite of the apple," accepting the constitutionality of the ALJ's appointment if the ALJ renders a favorable decision, but challenging the ALJ's appointment to obtain another hearing if not.

---

[12] It seems that one magistrate judge has issued a report and recommendation disagreeing with the majority of courts and recommending the district judge address the merits of the Appointments Clause argument, but that report and recommendation has not yet been adopted, and it is not available on Westlaw or Pacer (it is discussed by the court in *Valasquez*). *See Valasquez*, 2018 WL 6920457, at *3 (discussing *Muhammad v. Berryhill*, No. 18-172 (E.D. Pa. Nov. 2, 2018)).

On the other hand, the purpose of requiring issues be raised to the agency before they are raised to the court is to "permit[] agencies 'to exercise discretion and apply their expertise, . . . allow[] complete development of the record before judicial review, . . . prevent[] parties from circumventing the procedures established by Congress, and . . . avoid[] unnecessary judicial decisions by giving the agency an opportunity to correct errors." *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 656 (8th Cir. 1999) (discussing administrative exhaustion as it relates to the Individuals with Disabilities Education Act); *see also In Home Health, Inc. v. Shalala*, 272 F.3d 554, 560 (8th Cir. 2001) (discussing administrative exhaustion as it relates to the Medicare Act); *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 407 (D.D.C. 2008) (discussing administrative exhaustion as it relates to the Department of the Interior). "When the logic supporting the exhaustion doctrine is not applicable, a plaintiff's failure to exhaust administrative remedies may be excused." *Tunica-Biloxi Tribe*, 577 F. Supp. 2d at 407 (quoting *Arizona v. Shalalala*, 121 F. Supp. 2d 40, 50 (D.D.C. 2000)). The Eighth Circuit has recognized "three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law." *Blackmon ex rel. Blackmon*, 198 F.3d at 656.

Dyslin suggests that his failure to challenge the ALJ's appointment to the Social Security Administration should be excused as futile. He relies on the Commissioner's "emergency messages," the first of which was issued in January 2018 after the Supreme Court granted certiorari in *Lucia*. The original emergency message (EM-18003) and the revised emergency message issued shortly after the *Lucia* decision (EM-18003 REV) both instructed ALJs and the Appeals Council not to "discuss" or "make findings related to" the Appointments Clause issue if it were raised (and it further instructed ALJs to "acknowledge" in their decision that the issue was raised, but prohibited the Appeals Council from doing so). *See* Doc. 17-1. The emergency messages further state that the Social Security Administration "lacks the authority to finally decide constitutional issues

such as these." The Social Security Administration replaced these emergency messages on August 6, 2018; this revised emergency message (EM-18003 REV 2) directs ALJs to deny Appointments Clause challenges raised on or after July 16, 2018, as without merit, since "the Acting Commissioner ratified the appointment of ALJs" on that date. EM-18003 REV 2, https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM (last visited January 7, 2019). The emergency messages had not been issued when Dyslin's claim was pending before the ALJ or the Appeals Council. Thus, had Dyslin challenged the ALJ's appointment, the ALJ might have proceeded as directed in the first two emergency messages, but it is also possible that the ALJ would have addressed the merits of the argument (especially given that the emergency messages appear to disagree on whether it is appropriate for the Social Security Administration to address constitutional arguments). Moreover, the revised emergency message (EM-18003 REV 2) demonstrates that if Dyslin had raised an Appointments Clause challenge, the Social Security Administration might have attempted to correct the issue by having the Commissioner ratify the appointments of the ALJs. Several district courts have considered similar arguments regarding the emergency messages and declined to excuse a claimant's forfeiture on that basis. *See Flack*, 2018 WL 6011147, at *4; *Willis v. Comm'r of Soc. Sec.*, No. 1:18-CV-158, 2018 WL 6381066, at *4 (S.D. Ohio Dec. 6, 2018); *Stearns*, 2018 WL 4380984, at *4-5.

Although the Supreme Court had not yet issued certiorari in *Lucia* at the time Dyslin's claim was pending before the Social Security Administration, he could have raised the Appointments Clause argument based on *Freytag*. *See also Page v. Comm'r of Soc. Sec.*, No. CV 17-13716, 2018 WL 5668850, at *3 & n.4 (E.D. Mich. Oct. 31, 2018) (noting claimant was on notice of Appointments Clause issue based on 2016 circuit split regarding the application of *Freytag* to SEC ALJs). Nevertheless, I recognize the unlikelihood of the Social Security Administration addressing the merits of Dyslin's Appointments Clause argument had it been raised. I also note that the constitutionality

of the ALJ's appointment is not an area in which the Social Security Administration has any specialized expertise, nor does the analysis of this issue require any factfinding from the agency. And while allowing Dyslin to raise the Appointments Clause challenge at this stage could promote "sandbagging," I note that the Supreme Court in *Lucia* found the petitioner's challenge timely, even though he did not raise the issue to the ALJ—he waited until *after* the ALJ issued an unfavorable decision and raised the issue to the SEC, to which (unlike the Social Security Appeals Council) issue exhaustion is required to obtain judicial review of an argument. *See* 15 U.S.C. § 77i. It does not seem that the purposes of the forfeiture and exhaustion rules are served by declining to excuse forfeiture in this instance.

Ultimately, however, I rely on the Eighth Circuit's language in *RELCO Locomotives* that consideration of an Appointments Clause challenge raised for the first time on judicial review is discretionary. I decline to part from the tens of courts that have already decided this issue in the Commissioner's favor. Like the other courts to address this issue, I recommend the district court decline to exercise its discretion to excuse Dyslin's failure to raise his Appointments Clause challenge at any point before the Social Security Administration.

Because I recommend finding Dyslin forfeited the argument, I decline to address the merits. If the district court decides to remand for further proceedings, I would not preclude Dyslin from challenging the constitutionality of the ALJ's appointment on remand. *See Weatherman v. Berryhill*, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at *4 (W.D.N.C. Dec. 10, 2018); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018); *Clayton C. v. Comm'r of Soc. Sec.*, No. C18-638 BHS-BAT, 2018 WL 5985255, at *4 (W.D. Wash. Oct. 16, 2018), *report and recommendation adopted sub nom. Christianson v. Berryhill*, 2018 WL 5962899 (Nov. 14, 2018).

### III.    CONCLUSION

I recommend that the district court **reverse** the decision of the Commissioner, enter judgment in favor of Dyslin, and **remand** for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 22nd day of February, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

30