# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| LARRY D. DYSLIN, II., <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | No. C18-14-LTS <br><br> **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

This case is before me on a Report & Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge. Doc. No. 19. Judge Mahoney recommends that I reverse the decision of the Commissioner of Social Security (the Commissioner) denying plaintiff Larry Dyslin's application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Act), and remand for further proceedings. Both parties have filed timely objections (Doc. Nos. 20, 21) to the R&R.

## II. APPLICABLE STANDARDS

### A. *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The

Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

To determine whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court "must search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citation omitted).

To evaluate the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citation omitted), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citation omitted). Instead, if, after reviewing the evidence, the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even if the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (citation omitted). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is

not subject to reversal simply because some evidence may support the opposite conclusion.").

## B. *Review of Report and Recommendation*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

3

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III.  THE R&R

Dyslin applied for SSI on September 22, 2014, alleging an onset date of January 1, 1987, due to schizophrenia, bipolar disorder, borderline personality disorder, antisocial personality disorder and impulse control disorder. AR 12, 14.  After a hearing, an Administrative Law Judge (ALJ) applied the familiar five-step evaluation and found there were jobs in significant numbers in the national economy that Dyslin could perform based on his residual functional capacity (RFC) and, therefore, he was not disabled as defined in the Act. AR 22–23.  Dyslin argued that the ALJ erred in determining he was not disabled because (1) the ALJ improperly relied on the testimony of the vocational expert (VE), (2) the evidence showed Dyslin is unable to function outside of a "highly structured, supportive environment" and (3) the ALJ's appointment was unconstitutional. *See* Doc. No. 11 at 3–14.  Judge Mahoney addressed each argument in her R&R.

Dyslin first argued that the ALJ erred in relying on the VE's testimony because he failed to resolve a conflict between the testimony and the O*NET database of occupational information. Doc. No. 19 at 6–7.  Judge Mahoney found that VE testimony cannot constitute substantial evidence to prove that jobs exist in significant numbers in the national economy if the VE testimony conflicts with the Dictionary of Occupational Titles (DOT). *Id.* at 7.  However, she concluded that this is not necessarily true with regard to O*NET. *Id.* at 9.  In any event, Judge Mahoney found that the VE's testimony was not in direct conflict with O*NET. *Id.* at 8–9.

Dyslin also argued that the ALJ erred in relying on the VE's testimony because it did not support the personal hygiene limitations the ALJ found were necessary. *Id.* at 10.  Judge Mahoney found that an ALJ's reliance on a VE's testimony is improper if the VE changes a hypothetical beyond the ALJ's instructions. *Id.*  She explained,

> Here, the ALJ asked the VE if a hypothetical person with Dyslin's RFC, including someone who would not always be able to "maintain appropriate

4

personal hygiene or work attire," could perform work in the national economy. AR 66. The VE responded that "the question of clothing or hygiene would be an issue of whether or not it was offensive or not." *Id.* When the ALJ responded, "Understood," the VE elaborated: "So, if there's a correction to be made and there's a standard by the employer that says, you have so many reprimands based on my request and/or hygiene, then I believe once the -- if it's offensive to the other workers then it would eliminate positions, otherwise, I do not see it as a factor . . . . Those positions would remain as previously identified." *Id.* Dyslin argues that the VE's testimony does not support the ALJ's RFC determination because the ALJ did not resolve whether Dyslin's personal hygiene would offend others.

>   I agree (although I find it to be a close issue). . . .[T]he VE changed the hypothetical by adding that the hypothetical person's inability to always maintain personal hygiene would not be "offensive" to others. The ALJ did not specify in the decision the degree of Dyslin's personal-hygiene issues (are they nonoffensive?). *See Vail v. Barnhart*, 84 F. App'x 1, 2, 4 (10th Cir. 2003) (holding that VE's testimony did not support ALJ's step-five determination when VE testified no positions existed for a person that "would have to alternate sitting and standing as needed"; but that positions existed if the "brief changes of position" were not "as needed"; and the ALJ found the claimant needed "brief changes of position" without specifying "how often [the claimant] would need to change positions"). Nor did the ALJ ask the VE to elaborate on what he meant by offensive— Would some people be "offended" by a worker's bad body odor? Would it depend on the job the worker was doing? Would it depend how often the person had to interact with the worker? The VE here also suggested that by "offensive," he simply meant in violation of the employer's standards and subjecting the person to reprimand, although it is not entirely clear (and presumably, not wearing appropriate work attire would violate standards). I find the VE's testimony here . . . amounts to a "qualified response" or change to the hypothetical.

*Id.* at 10–11.

Next, Judge Mahoney addressed Dyslin's argument that the record shows he cannot function outside of a structured, supportive environment. *Id.* at 12. She explained that the ALJ found Dyslin did not meet the listing for either schizophrenia or personality

5

and impulse-control disorders because he did not satisfy the paragraph B or paragraph C criteria. *Id*.

> The paragraph B criteria for both Listings require marked limitations in two of the following categories (or an extreme limitation in one): (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. *Id*. §§ 12.03(B), 12.08(B). The ALJ found that Dyslin suffered marked limitations in interacting with others, but no greater than moderate limitations in the other categories. AR 15. The paragraph C criteria for Listing 12.03 require "a medically documented history of the existence of the disorder over a period of at least 2 years," as well as evidence of both "a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder" and evidence of the claimant's "marginal adjustment." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(C). The ALJ found Dyslin did not meet the "paragraph C" criteria because "[t]he record does not establish a medically documented history of a 'serious and persistent' disorder, lasting for a period of at least two years." AR 15.

*Id*. at 12–13. She found that Dyslin's argument is relevant to his limitations in adapting or managing himself and, therefore, whether he meets the paragraph B criteria for both listings. *Id*. Judge Mahoney found that "substantial evidence does not support the ALJ's overall conclusion that Dyslin could function in society (or hold gainful employment) without assistance from a supportive living community (or similar)." *Id*. at 14.

> In making his finding to the contrary, the ALJ relied heavily on an October 2016 treatment plan from Tschantz in which she noted that Dyslin is an "intelligent and mostly independent person." AR 17, 794. The ALJ failed to acknowledge that in that same treatment plan, Tschantz noted that Dyslin admitted he would "not manage his medications" without help and that a "goal" for the next year was for Dyslin to attend mental and physical health appointments by himself. AR 792, 797. The treatment plan further reflects that staff assisted Dyslin in numerous ways related to health appointments, including scheduling and tracking appointments, making a list of things to discuss with providers, obtaining a monthly bus pass for Dyslin, reviewing with Dyslin how to travel by bus to appointments, traveling to appointments with Dyslin, and helping him communicate with providers. AR 797-98. More than once, Tschantz noted in the treatment plan that Dyslin suffers from poor decision-making, including ending appointments with staff early,

6

> refusing to participate in therapy, and purchasing cigarettes over necessities. AR 793, 795. The treatment plan also reflects that Dyslin's intelligent quotient (IQ) was 70, which qualifies as "borderline intellectual functioning," and that Dyslin's Global Assessment of Functioning (GAF) score was 25. AR 793. Viewed as a whole, the treatment plan does not support that Dyslin would be able to function in society without staff support.

*Id.* at 14–15. Judge Mahoney further stated that evidence Dyslin can "function by himself 90% of the time does not constitute substantial evidence" he can function outside of a structured setting. *Id.* at 16. In fact, Judge Mahoney found that "the overall record overwhelmingly supports that without the assistance he receives in medication management, Dyslin would be disabled." *See id.* at 16–19 (detailing evidence showing he needs assistance to manage his medications). She concluded that the ALJ erred when he found Dyslin did not require a supportive living environment and recommends remanding the case for the ALJ "to further consider the effects of Dyslin's living in a structured setting on his ability to 'adapt or manage [him]self' for purposes of meeting a listing" and to further explain his findings. *Id.* at 20–21.

Finally, Judge Mahoney addressed Dyslin's Appointments Clause challenge. *Id.* at 21. She noted that "Dyslin did not challenge the validity of the ALJ's appointment at any point during the administrative proceedings." *Id.* at 22. After reviewing the case law, Judge Mahoney stated,

> Ultimately, however, I rely on the Eighth Circuit's language in *RELCO Locomotives* that consideration of an Appointments Clause challenge raised for the first time on judicial review is discretionary. I decline to part from the tens of courts that have already decided this issue in the Commissioner's favor. Like the other courts to address this issue, I recommend the district court decline to exercise its discretion to excuse Dyslin's failure to raise his Appointments Clause challenge at any point before the Social Security Administration.

*Id.* at 29.

## IV. ANALYSIS

In objecting to the R&R, the Commissioner argues (1) that substantial evidence supports the ALJ's step five finding and (2) the ALJ properly considered Dyslin's supportive living environment. Doc. No. 20 at 2, 4. In his objections, Dyslin argues (1) that the case should be remanded for the award for benefits, rather than for further proceedings, and (2) that if the court decides not to remand, the court should address his Appointments Clause challenge. Doc. No. 21 at 1–2. I will address each objection separately.

### A. *ALJ's Step Five Finding*

The Commissioner argues the ALJ properly relied on the VE's testimony because it was not a qualified response or change to the ALJ's hypothetical question. *Id.* at 2–3. The Commissioner claims that the ALJ did address the degree of Dyslin's personal hygiene issues and the evidence shows he was able to take care of his personal needs and grooming. *Id.* at 3–4. Thus, the VE's testimony was consistent with the ALJ's finding. *Id.* at 4.

"The Commissioner can rely on the testimony of a vocational expert to carry her burden of proof of showing that jobs exist in the national economy that a claimant can perform." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). The testimony must be "based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)).

In *Penn v. Sullivan*, 896 F.2d 313 (8th Cir. 1990), the Eighth Circuit found that there was no substantial evidence when the ALJ relied on a VE's testimony without acknowledging the qualifications in the VE's response. The ALJ had determined that the claimant could work an eight-hour shift if she was allowed to sit or stand at will. *Id.* at

315. The ALJ then asked the VE to assume the claimant could sit for a maximum of four hours in an eight-hour day and could stand for a maximum of one hour in an eight-hour day. *Id.* at 316. The VE "explicitly qualified his response by stating [there were a number of jobs available with those restrictions] only if it was assumed that the claimant had the capacity to work a full eight-hour day." *Id.* The Eighth Circuit found the ALJ could not rely on that response because the ALJ "failed to acknowledge that the VE had significantly qualified his response" when he assumed the claimant could work a full day, even though the ALJ stated the claimant could sit no more than four hours in a day and could stand for less than an hour. *Id.* at 317.

On the other hand, in *Travis v. Astrue*, 477 F.3d 1037 (8th Cir. 2007) the Eighth Circuit found substantial evidence based on the VE's testimony. In that case, the ALJ asked if the claimant's poor ability to follow work rules would affect her ability to perform the job of a cashier. *Id.* at 1043. The VE stated "normally I would say yes except she has a fair ability to follow simple instructions and it's an unskilled job" and that the job would require "a level of attention and concentration . . . . I guess there could be an issue there if that in and of itself would be enough to keep a person from performing that job." *Id.* The Eighth Circuit found the VE simply stated his opinion and raised an issue for the ALJ. "The expert did not change the hypothetical question or rely on criteria not mentioned by the ALJ. As the ALJ did not find that Travis suffered those attention and concentration limitats [raised by the VE], the expert's equivocal response does not contradict his prior response to the ALJ's hypothetical question." *Id.*

During the disability hearing in this case, Sarabeth Tschantz, Dyslin's case manager from the Cedar Valley Community Support Services, testified that Dyslin has trouble with hygiene and needs prompts or reminders from staff. AR 53. The ALJ questioned her about a portion of her report indicating that Dyslin "is an intelligent and mostly independent person." AR 54. Tschantz went on to testify that while Dyslin needs reminders to take showers, he would still take them on his own, just not as often. AR

9

59–60. After Tschantz's testimony, the ALJ presented four hypotheticals to the VE. The first hypothetical was:

> I would ask for you to assume a hypothetical person of the claimant's age, education, and work experience. And further assume that the individual is limited as follows. No exertional limitations. No more than occasional interaction with supervisors, coworkers or the general public. The individual would not be required to maintain sustained focus, attention, or concentration for extended periods, which I would define as two hours at a time with a five-minute break and then two hours again throughout the day. And that the individual would not be required to set their own goals or make their own work plans independently.

AR 63–64. The fourth hypothetical was:

> [H]ypothetical #4 same as hypothetical #1 with the following modifications. No more than occasionally dealing with requests, suggestions, criticism, or correction and that the individual would not be required to always maintain appropriate personal hygiene or work attire. With that could the hypothetical individual perform any other work in the national economy?

AR 66. This exchange followed:

> A. Your Honor, the opinion and experience and it would essentially be the occasional request, understanding and procedure within a job position, the question of clothing or hygiene would be an issue of whether or not it was offensive or not.
>
> Q. Understood.
>
> A. So, if there's a correction to be made and there's a standard by the employer that says, you have so many reprimands based on my request and/or hygiene, then I believe once the – if it's offensive to the other workers then it would eliminate positions, otherwise, I do not see it as a factor, Your Honor.

*Id.*

In his opinion, the ALJ wrote that Dyslin "could not be required to always maintain appropriate personal hygiene and work attire." AR 16. The ALJ gave little weight to Tschantz's opinion that Dyslin could not understand or care about the

10

consequences of "failing to do basic activities of daily living, such as showering." AR 17. He also gave little weight to a third party function report from Dyslin's father that noted Dyslin requires reminders for personal hygiene. AR 17–18. On the other hand, the ALJ gave significant weight to mental status exams that indicated Dyslin had good grooming and hygiene and was generally improving his hygiene habits. AR 19. The ALJ did not, however, specifically discuss the parameters of his hygiene limitation beyond what was listed in the RFC.

The Cedar Valley Community Support Services social history form from 2015 notes that Dyslin "struggles to follow through with hygiene, dress and grooming tasks." AR 786. An update in 2016 indicates that he continued to receive assistance with "daily living skills such as hygiene needs." AR 788. Dyslin stated in his own function report that he has no problems with personal care. AR 76, 86, 210. Records from psychiatric care encounters show Dyslin's hygiene ranging from "within normal limits" (AR 503, 512, 534, 540, 542, 546, 548, 550, 552, 55) to clean/neat (AR 504, 512, 516, 519, 528, 530) to unkempt (AR 532, 536, 544). An assessment from Abbe Center for Community Mental Health notes that Dyslin's grooming and hygiene ranged from good (AR 639) to adequate (AR 644).

After reviewing these records, the ALJ indicated that Dyslin could not always be expected to maintain "appropriate" personal hygiene.[1] Even though the ALJ acknowledged the VE's qualification that the claimant's hygiene could not be "offensive" at the hearing, he did not address it in his opinion. AR 22. While it is possible "inappropriate" and "offensive" could have different definitions, neither the VE nor the ALJ sufficiently distinguished the two or explained what was meant by "offensive"

---

[1] The Commissioner argues that Dyslin was not "significantly limited his ability to adhere to basic standards of neatness and cleanliness" but the ALJ's RFC limitation appears to somewhat belie that point. Doc. No. 30 at 4. In any event, the question is whether the VE's testimony changed or qualified the limitations the ALJ imposed even if Dyslin was not significantly limited in his ability to maintain basic standards of hygiene.

11

hygiene. I agree with Judge Mahoney that the VE's testimony amounts to a qualified response that, without acknowledgement or explanation, cannot support the ALJ's step-five determination.

### B.     *Supportive Living Environment*

Judge Mahoney found that substantial evidence does not support the ALJ's conclusion that Dyslin could function in society without assistance. Doc. No. 19 at 14. Judge Mahoney focused on the quality and degree of independence Dyslin presented and found "the record overwhelmingly supports that the help he receives is vital to his ability to function." *Id.* at 19–20. She remanded for the ALJ to "further consider the effects of Dyslin's living in a structured setting on his ability to 'adapt or manage [him]self' for purposes of meeting a listing" and further explain his findings. *Id.* at 21.

The Commissioner argues that the ALJ acknowledged Dyslin's supportive living environment but "a particular living arrangement does not determine functional abilities, nor does it automatically indicate a claimant is markedly limited in his ability to adapt and manage himself." Doc. No. 20 at 4–5. The Commissioner contends that the ALJ properly considered Dyslin's treatment plan and history. *Id.* at 5–6. Additionally, the Commissioner argues that the fact Dyslin receives assistance with medication management "does not automatically confer disability" and in any case, the record does not indicate that Dyslin is unable to comply with treatment. *Id.* at 6–8.

The Commissioner cites *Boeser v. Colvin*, No. CV 12-1651 (JSM), 2013 WL 12142543 at *28 (D. Minn. Sept. 17, 2013), to support the proposition that a supportive living environment "does not determine functional abilities" or indicate the claimant cannot manage himself. Doc. No. 20 at 5. In *Boeser*, the claimant lived alone in an apartment but had "one or two episodes of decompensation based on her stay in a building with supported living services." 2013 WL 12142543 at *28. The district court found that the use of supported living services was equivalent to "one or two episodes of decompensation" and that "did not result in any specific work-related limitation on mental

12

activities." *Id.* The ALJ acknowledged the supported living services but also discussed other part-time work that indicated an ability to function in a work-like setting. *Id.* The court also found that the ALJ properly accounted for the claimant's moderate limitations in the RFC. *Id.* at *28-*29.

This case is different because Dyslin has consistently lived in a supportive living environment and uses those services three to four times a week, on average, for one to two hours. AR 17, 44, 54, 787–88. While the use of supportive living services does not automatically confer disability, the ALJ must consider its effect on the claimant's ability to function. Under the Commissioner's regulations, the ALJ should consider "the complete picture of [the claimant's] daily functioning, including the kinds, extent, and frequency of help and support" received. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(D)(3). Daily functioning may depend on a special context, such as supportive living services, that "does not necessarily show how [the claimant] would function in a work setting on a sustained basis, throughout a normal workday and workweek." *Id.*

Therefore, the question is whether the ALJ properly considered the effect of Dyslin's need to live in a structured setting on his ability to adapt or manage himself. The ALJ found that Dyslin had only moderate limitations in his ability to adapt and manage himself for reasons "discussed in detail in finding four." AR 15. In finding four, which was the RFC finding, the ALJ noted Dyslin's testimony that he resides in a supportive living environment and receives help with various tasks, including medication management. AR 17. He noted that Dyslin's father testified that Dyslin needs reminders for those tasks. *Id.* The ALJ also discussed Tschantz's opinion that Dyslin would not be able to function without staff support but gave that opinion little weight because it was not consistent with her statement that Dyslin lives independently, is on his own most of the week and "is an intelligent and mostly independent person." AR 17.

The ALJ then moved on to medical evidence and objective findings, stating that they "do not support the existence of limitations greater than the above listed residual functional capacity." AR 18. He briefly touched on Dyslin's incarceration, his bouts of

13

noncompliance with medication while incarcerated and highlights the fact that medical records showed Dyslin's mental status was stable when he was compliant with medications. AR 18–19. The ALJ concluded that while he was "mindful the claimant has been residing within supportive living environments since October of 2015 . . . [Dyslin] remains generally independent within this environment." AR 19–20. The ALJ did not elaborate on Dyslin's need for the supportive living environment. I agree with Judge Mahoney that this is not a sufficient consideration of the effect supportive living services has on Dyslin's ability to function.

There is no dispute that without medication Dyslin would be unable to work. Doc. No. 19 at 17–19. Even the state agency consultants' opinions state that Dyslin can complete simple, repetitive tasks in a low stress environment so long as there is "ongoing compliance." AR 77, 87. But without support, the record indicates it is unlikely Dyslin would continue taking his medications. As Judge Mahoney noted, "any time Dyslin has been on his own, he has refused medications and other mental-health treatment, his mental health has deteriorated, and he as ultimately ended up in prison or under a civil commitment." Doc. No. 19 at 19. The Commissioner argues, however, that while on medication Dyslin has the mental capacity to comply with treatment. Doc. No. 20 at 8. This is not so clear.

The ALJ gave little weight to Tschantz's opinion that Dyslin could not function without supportive living services because she stated that Dyslin is an "intelligent and mostly independent person" and "understands the importance of medication compliance." AR 794. While Dyslin may understand the importance of medication compliance, the record indicates that he may not be able to maintain that compliance without significant support due to his mental impairments. Dyslin was institutionalized on and off from the ages of 12 to 34. AR 245, 638. After he was released from prison in 2014, he no longer took medications. AR 245–46, 664. When declining to take medications, he explained that he felt like he did not need them. *Id*. Unity Point Health records show that when Dyslin does not take his medications he has poor judgment. AR 259. In 2015, an office

14

visit record indicated that he continued to not take medications. AR 658. According to his social history report with Cedar Valley Community Support Services, "he has a history of stopping psychotropic medications against the advice of his providers." AR 788.

Unity Point Health records also show even when Dyslin is compliant, his insight into his own illness is "fair to poor" and his judgment is fair. AR 247–48. The Department of Corrections Health Services generally notes the same, stating that his insight is fair or "fair to poor" (AR 418, 422, 428, 432, 438, 442, 448, 454, 500, 514, 519, 621), as do treatment records from the Abbe Center for Community Health (AR 644, 652, 657, 669, 672). Dyslin's mental health treatment plans in 2013 and 2014 continued to set a goal of complying with medications, indicating he continued to struggle. AR 557–68. Even after a year of taking medication, records show he still needed support with hygiene, community involvement and medication compliance. AR 788. The social history report indicates that Dyslin "demonstrates poor insight into his mental health needs," struggles with daily living tasks and will not seek mental health treatment on his own. AR 786.

I recognize the Commissioner's argument that a claimant is not disabled when medication controls a condition that, if untreated, would be disabling. Doc. No. 20 at 8 (citing *Hensley v. Colvin*, 829 F.3d 926, 933 (8th Cir. 2016)). However, "[t]reatment may not resolve all of the limitations that result from" the claimant's mental disorder. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(D)(3)(4). The medical evidence shows that medication is not sufficient, as Dyslin also requires treatment in the form of supportive services to maintain his compliance and complete other facets of daily living. I agree with Judge Mahoney that the ALJ did not sufficiently address Dyslin's need for supportive services in his medical listing determination.

## C. Remedy

Dyslin argues that his claims should be remanded for an award of benefits because remanding for further consideration is "unnecessarily cautious and could lead to an unnecessary delay in benefits in a case where overwhelming evidence supports a finding of disability." Doc. No. 21 at 2. The district court may reverse a decision of the Commissioner "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Ordinarily, the court remands the case for further proceedings out of "abundant deference to the ALJ." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). The Eighth Circuit has held that the court may remand for an award of benefits "only if the record 'overwhelmingly supports' such a finding." *Id.* (quoting *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992)).

While I find that the ALJ erred, I do not find that the record "overwhelmingly" supports a finding of disability and an award of benefits. Therefore, I reject Dyslin's argument and will remand this matter for further proceedings.

## D. Appointments Clause

Judge Mahoney did not reach the merits of Dyslin's Appointment Clause challenge but stated that upon remand she "would not preclude Dyslin from challenging the constitutionality of the ALJ's appointment." Doc. No. 19 at 29. The Commissioner did not object to this finding and Dyslin objects only if this case is not otherwise remanded. Doc. No. 21 at 2. Therefore, I have reviewed this portion of Judge Mahoney's R&R for clear error. *See, e.g.*, *Grinder*, 73 F.3d at 795. After review, I find that Judge Mahoney applied the appropriate legal standards and find no clear error in her recommended disposition of the Appointment Clause challenge.

## V. CONCLUSION

For the reasons set forth herein:

16

1. The Commissioner's objections (Doc. No. 20) and Dyslin's objections (Doc. No. 21) to the Report and Recommendation (Doc. No. 19) are all **overruled in their entirety**.

2. I **accept** the Report and Recommendation (Doc. No. 19) without modification. *See* 28 U.S.C. § 636(b)(1).

3. Pursuant to Judge Mahoney's recommendation:

    a. The Commissioner's determination that Dyslin was not disabled is **reversed** and this matter is **remanded** to the Commissioner for further proceedings as described by Judge Mahoney.

    b. Judgment shall enter in favor of Dyslin and against the Commissioner.

    c. If Dyslin wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, an application may be filed up until 30 days after the judgment becomes "not appealable," i.e., 30 days after the 60-day time for appeal has ended. *See Shalala v. Schaefer*, 509 U.S. 292, 296 (1993); 28 U.S.C. §§ 2412(d)(1)(B), (d)(2)(G).

**IT IS SO ORDERED.**
**DATED** this 25th day of March, 2019.

_____
Leonard T. Strand, Chief Judge